IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

AVIV HADAR, DAVID FIELDS, and THINK
BRILLIANT MEDIA STUDIOS, LLC,

          Plaintiffs

                                             CV 10-796-PK

v.

                                           AMENDED OPINION

RAINN WILSON, SOULPANCAKE, LLC, and              AND ORDER
PAYAM ZAMANI,

          Defendants;

SOULPANCAKE, LLC, and RAINN WILSON,

          Third-Party Plaintiffs

v.

THINK BRILLIANT MEDIA STUDIOS, LLC,
AVIV HADAR, DAVID FIELDS, TOM FITE,
DARREN BUCKNER, and SAM WESTON,

          Third-Party Defendants.

PAPAK, Magistrate Judge:

      This court's Opinion and Order (#49) dated June 9, 2011, issued at a time when fewer

than all of the parties to this action had consented to magistrate jurisdiction. Effective June 24,

2011, all parties have since consented to jurisdiction by a U.S. Magistrate Judge. The court's

Opinion and Order (#49) dated June 9, 2011, is therefore withdrawn, and this Amended Opinion

and Order is issued in its stead.

Page 1 - AMENDED OPINION AND ORDER

Plaintiff Think Brilliant Media Studios, LLC ("Think Brilliant"), filed this action against defendants SoulPancake, LLC ("SoulPancake"), and Soulcake principal Rainn Wilson on July 9, 2010.  SoulPancake and Wilson answered Think Brilliant's complaint on July 22, 2010, alleging counterclaims against Think Brilliant and crossclaims against Aviv Hadar and David Fields (each, a Think Brilliant principal) and against Tom Fite, Darren Buckner, and Sam Weston (each, a Think Brilliant employee).  On January 31, 2011, Think Brilliant amended its complaint, adding Hadar and Fields as additional plaintiffs and adding Payam Zamani, a part-owner of SoulPancake, as an additional defendant.  On February 18, 2011, defendants amended their answer, alleging counterclaims against Think Brilliant, Hadar, and Fields, and crossclaims against Fite, Buckner, and Weston.  On March 11, 2011, third-party defendants Fite, Buckner, and Wilson filed counterclaims against the defendants.

The parties' various disputes arise out of a business relationship among Hadar, Fields, Wilson, as well as the business entities Think Brilliant and SoulPancake, that lasted from approximately April 2008 through July 2010.  In their first amended complaint, Think Brilliant, Hadar, and Fields allege SoulPancake and Wilson's liability for breach of fiduciary duty, fraud, breach of contract, and quantum meruit, further allege SoulPancake, Wilson and Zamani's liability for misappropriation of trade secrets, further allege Zamani's liability for civil conspiracy, further allege that SoulPancake and Wilson are estopped from denying that plaintiffs have a partial ownership interest in SoulPancake, and request imposition of a constructive trust against SoulPancake and Wilson, injunctive relief to enjoin SoulPancake and Wilson from using certain work-product allegedly proprietary to plaintiffs, and declaratory judgment that Think Brilliant owns a specified interest in SoulPancake.  By and through their answer to plaintiffs' first

amended complaint, defendants allege counterclaims of fraud, negligent misrepresentation, conversion, breach of contract, and breach of the covenant of good faith and fair dealing against Think Brilliant, and seek declaratory judgment that ThinkBrilliant has no ownership interest in SoulPancake and that SoulPancake is the 100% owner of Think Brilliant-developed software applications known as "LabCoat" and "Ziphook." Third-party defendants Fite, Buckner, and Wilson counterclaim against defendants Wilson and SoulPancake for their attorney fees only.

Now before the court are plaintiffs' motion (#39) to dismiss or to strike defendants' affirmative defenses, to strike defendants' claims for attorney fees, to strike certain "evidentiary" material from defendants' answer, and to dismiss or to make more definite and certain defendants' claim of fraud, and defendants' motion (#41) to dismiss all of plaintiffs' claims against Zamani for lack of personal jurisdiction, to dismiss or to make more definite and certain plaintiffs' claim of fraud, and to dismiss plaintiffs' quantum meruit claim. I have considered the parties' motions, oral argument on behalf of the parties, and all of the pleadings on file. For the reasons set forth below, each motion is granted in part and denied in part, as discussed below.

## LEGAL STANDARDS

### I.    Motion to Dismiss for Failure to State a Claim

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6), a complaint must contain more than a "formulaic recitation of the elements of a cause of action;" specifically, it must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To raise a right to relief above the speculative level, "[t]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id.*, *quoting* 5 C. Wright

Page 3 - AMENDED OPINION AND ORDER

& A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004); *see also* Fed. R.

Civ. P. 8(a).  Instead, the plaintiff must plead affirmative factual content, as opposed to any

merely conclusory recitation that the elements of a claim have been satisfied, that "allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009).  "In sum, for a complaint to survive

a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that

content, must be plausibly suggestive of a claim entitling the plaintiff to relief."  *Moss v. United*

*States Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009), *citing Iqbal*, 129 S. Ct. at 1949.

"In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained

in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial

notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).  In considering a motion to

dismiss, this court accepts all of the allegations in the complaint as true and construes them in the

light most favorable to the plaintiff.  *See Kahle v. Gonzales*, 474 F.3d 665, 667 (9th Cir. 2007).

Moreover, the court "presume[s] that general allegations embrace those specific facts that are

necessary to support the claim."  *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256 (1994),

*quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The court need not, however,

accept legal conclusions "cast in the form of factual allegations."  *Western Mining Council v.*

*Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

## II.    Motion to Strike

Federal Civil Procedure Rule 12 provides that the district courts "may strike from a

pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter"

on their own initiative or pursuant to a party's motion.  Fed. R. Civ. P. 12(f). The disposition of a

motion to strike is within the discretion of the district court. *See Federal Sav. & Loan Ins. Corp. v. Gemini Management*, 921 F.2d 241, 244 (9th Cir. 1990). Motions to strike are disfavored and infrequently granted. *See Stabilisierungsfonds Fur Wein v. Kaiser, Stuhl Wind Distribs. Pty., Ltd.*, 647 F.2d 200, 201, 201 n.1 (D.C. Cir. 1981); *Pease & Curren Refining, Inc. v. Spectrolab, Inc.*, 744 F. Supp. 945, 947 (C.D. Cal. 1990), abrogated on other grounds by *Stanton Road Ass'n v. Lohrey Enters.*, 984 F.2d 1015 (9th Cir. 1993).

## III.   Motion to Make More Definite and Certain

Federal Civil Procedure Rule 12(e) provides, in relevant part, as follows:

A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired.

Fed. R. Civ. P. 12(e). Motions for more a definite statement are disfavored and are "proper only where the complaint is so indefinite that the defendant cannot ascertain the nature of the claim being asserted." *Sagan v. Apple Computer, Inc.*, 874 F. Supp. 1072, 1077 (C.D. Cal.1994). Where a responsive pleading can reasonably be framed, a motion for more definite statement should be denied. *See*, *e.g.*, *Bureerong v. Uvawas*, 922 F. Supp. 1450, 1461 (C.D. Cal. 1996); *see also* Fed. R. Civ. P. 12(e). Similarly, where the detail sought by a motion for more definite statement is available through discovery, the motion should be denied. *See Beery v. Hitachi Home Elecs. (Am.)*, 157 F.R.D. 477, 480 (C.D. Cal. 1993).

## IV.   Motion to Dismiss for Lack of Personal Jurisdiction

A motion to dismiss for lack of personal jurisdiction is governed by Federal Civil Procedure Rule 12(b)(2). *See* Fed. R. Civ. P. 12(b)(2). "In opposition to a defendant's motion to

dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008), *citing Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990). In evaluating the defendant's motion, "[t]he court may consider evidence presented in affidavits to assist it in its determination and may order discovery on the jurisdictional issues." *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001), *citing Data Disc, Inc. v. Systems Technology Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). If the court decides the motion based on the pleadings and affidavits submitted by the parties without conducting an evidentiary hearing, "the plaintiff need make only a *prima facie* showing of jurisdictional facts to withstand the motion to dismiss." *Id.*, *quoting Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). In the absence of such an evidentiary hearing, the court accepts uncontroverted allegations contained within the plaintiff's complaint as true, and resolves conflicts between statements contained within the parties' affidavits in the plaintiff's favor. *See id.*

## FACTUAL BACKGROUND

In December 2007, defendant Rainn Wilson and his business associates Devon Gundry and Joshua Homnick incorporated defendant SoulPancake, LLC (a California company), for the purpose of creating "content and thought-provoking engagement opportunities across multiple platforms." In March 2008, plaintiffs Aviv Hadar and David Fields formed plaintiff Think Brilliant Media Studios, LLC (an Oregon company), for the purpose of designing and engineering websites and social media platforms. In April 2008, Wilson contacted Hadar to discuss a project to develop a new social networking platform for SoulPancake. Hadar brought Fields into the discussion, and the parties orally agreed to enter into a joint venture to develop the

proposed platform.

Plaintiffs and defendants appear to agree that according to the parties' oral agreement, Wilson – a television actor – would commit his "time, energy, and celebrity" to developing content for the project, to promoting the project, and to finding investors for the project, and would also provide some portion of necessary funding, while Hadar and Fields would commit their "time, energy, and expertise" to developing a website to host the project, to developing a platform (the "LabCoat" platform) for the project, to developing revenue-generating features for the project, to assisting in developing content for the website, and to soliciting investors for the project. Hadar and Fields agreed to use Think Brilliant to implement their end of the arrangement, while Wilson would work through SoulPancake. Plaintiffs and defendants appear to agree that Wilson committed to incorporating a new entity, soulpancake.com, LLC, to administer the contemplated SoulPancake website, but it appears that he never did so.

Plaintiffs and defendants appear to agree that, pursuant to the parties' oral agreement, SoulPancake would periodically reimburse Think Brilliant for its expenses incurred in developing the project, including the salaries and health benefits of Hadar and Fields and the coders they hired to work on the social media project (namely, third-party defendants Weston, Buckner, and Fite), as well as office rent, business taxes, and other expenses.

According to plaintiffs, the parties initially agreed that, in addition to funding supplied by SoulPancake, Think Brilliant would receive an ownership interest in SoulPancake, LLC, as part of Hadar's and Fields' compensation for their services. According to plaintiffs, Wilson later modified the parties' agreement, and ultimately the parties agreed that Think Brilliant would receive a 3% interest in SoulPancake, LLC, and an 18% interest in soulpancake.com, LLC (the

Page 7 - AMENDED OPINION AND ORDER

entity that was to be incorporated but never was).  According to defendants, by contrast, in March 2009 the parties initially discussed a proposal pursuant to which Think Brilliant could potentially earn up to an 18% equity stake in the contemplated soulpancake.com entity, apparently as a bonus for good performance, and had further discussions of the proposal in October and November 2009, but never reached firm agreement on the proposal.  Defendants also dispute plaintiffs' allegations regarding the 3% interest in SoulPancake itself, taking the position that the parties discussed an equity exchange whereby SoulPancake would take a 3% ownership interest in Think Brilliant and Think Brilliant would take a 3% ownership interest in SoulPancake as a "mutual bonus for a long-term relationship," but that the contemplated equity exchange never took place as a result of the failure of the parties' relationship to survive over a long term.  It is moreover defendants' position that it was always a contemplated condition precedent to any such agreement that Think Brilliant and its personnel would devote their business time exclusively to the SoulPancake project, and that this condition precedent was not satisfied.  Plaintiffs and defendants agree that, whatever the details of their oral agreement, it was never formalized as a written contract.

According to plaintiffs, Think Brilliant began working on the SoulPancake project in May 2008.  At that time, the heart of the technology that underlay the platform was an off-the-shelf product purchased from a third party and customized for SoulPancake's purposes by Think Brilliant.

Plaintiffs and defendants appear to agree that SoulPancake began funding Think Brilliant's operations in June 2008.  From June 2008 through early June 2009, SoulPancake apparently made payments to Think Brilliant totaling $73,395.

Page 8 - AMENDED OPINION AND ORDER

In June 2009, SoulPancake having experienced technical difficulties with the third-party technology then underlying the soulpancake.com website, the parties agreed that Think Brilliant would design and develop a custom platform for the SoulPancake project. The custom platform was initially known under the code name "Big Blue" but later came to be referred to as "LabCoat." In or around June 2009, Think Brilliant submitted a written proposal to SoulPancake pursuant to which SoulPancake would wholly fund Think Brilliant and Think Brilliant would devote 100% of its efforts to the SoulPancake project. According to defendants, the Think Brilliant proposal estimated that the monthly cost to develop the custom platform would be approximately $25,000. Plaintiffs and defendants appear to agree that, pursuant to the parties' earlier agreement, SoulPancake would wholly own the LabCoat platform once development was complete, although plaintiffs appear to suggest that the parties may have contemplated some form of profit-sharing arrangement whereby Hadar and Fields might have taken a share in profits generated by licensing LabCoat to third parties.

Between late June 2009 and early September 2009, SoulPancake apparently made payments to Think Brilliant in the total amount of $80,000.

In August 2009, Think Brilliant apparently notified SoulPancake that it would not be able to complete the project on time, and SoulPancake advised Think Brilliant that it would not be able to continue making monthly payments to think Brilliant in the amount of approximately $25,000. By around September 2009, the parties apparently agreed that SoulPancake would continue funding Think Brilliant at a monthly rate of approximately $17,000.

Between October 2009 and December 2009, SoulPancake apparently made payments to Think Brilliant in the total amount of $49,500. According to plaintiffs, in approximately

Page 9 - AMENDED OPINION AND ORDER

November 2009, Hadar solicited an investment in SoulPancake from his mother, who apparently

agreed to make the investment on the understanding that Hadar was a part-owner of

SoulPancake.  Hadar's mother apparently invested a total of $35,000 in SoulPancake.

In or around January 2010, Think Brilliant submitted a new written proposal to

SoulPancake.  According to defendants, the proposal provided for an approximately $25,000

monthly budget to cover all of Think Brilliant's operating expenses, including salaries, health

insurance benefits, office expenses, and business taxes, in exchange for Think Brilliant's

commitment that it and its employees would work exclusively on SoulPancake's project during

the time SoulPancake was funding Think Brilliant.  SoulPancake apparently agreed to the

proposal, and apparently made payments to Think Brilliant in the total amount of $168,645.92

between January 2010 and June 2010.[1]  According to defendants, these payments were expressly

conditioned on the accuracy of Think Brilliant's representations that its efforts were 100%

devoted to the SoulPancake project.

According to plaintiffs, beginning in approximately January 2010 Wilson began

attempting to squeeze Think Brilliant, Hadar, and Fields out of the SoulPancake project.

According to plaintiffs, it was at approximately this time that Wilson proposed a "transitive

equity" scheme whereby Think Brilliant would be granted a 3% ownership interest in

SoulPancake and an 18% equity interest in soulpancake.com, LLC.  According to plaintiffs,

Wilson repeatedly promised that his lawyers would soon provide paperwork to implement the

---

[1]  The total amount of the payments specifically set forth in defendants' pleading is
$371,540.92.  However, defendants recite a total payment amount of $399,510.92 (that is,
$27,970 in excess of the calculated total of described payments), and plaintiffs now appear to
concede that SoulPancake tendered "approximately $400,000" to Think Brilliant over the period
from June 2008 through June 2010.

Page 10 - AMENDED OPINION AND ORDER

transitive equity proposal, but the papers were never provided.  In addition, according to plaintiffs, Wilson began threatening to cut off Think Brilliant's funding.

According to plaintiffs, in the early months of 2010 Wilson began suggesting to the plaintiffs that they begin seeking work from other clients in order to generate the revenue needed to keep Think Brilliant's doors open.  It is plaintiffs' position that they "later" complied with Wilson's alleged suggestion, and that it is plaintiffs' compliance with Wilson's suggestion that forms the basis for defendants' claim that plaintiffs breached the exclusivity provision of their agreement with SoulPancake.

According to plaintiffs, in early 2010 Wilson began talking with defendant Zamani, "an extremely wealthy investor from the San Francisco Bay Area."  According to plaintiffs, Zamani owned a company performing web design and related development services similar to those provided by Think Brilliant.  According to plaintiffs, Hadar and Fields met with Zamani and Gundry in May 2010 on Wilson's instructions, and disclosed to them without reservation all of the details of their work on the SoulPancake project and specifically on LabCoat.

According to defendants, in May 2010, Wilson's business associate Gundry sent an email message to Hadar inquiring as to Think Brilliant's progress, apparently specifically inquiring about time Think Brilliant may have put into the redesign of the Think Brilliant website and/or a side project known as "MacBlogz."  Hadar wrote an email message in response asserting that:

> 99.99% of everyone's time is spent managing and developing SoulPancake, its code, surrounding partnerships and business prongs.  When I say we work at least 12 hours a day, it's on SoulPancake.  Every once in a while, MacBlogz will have a hiccup, and we will need to fix it, but we're talking about a few hours every few months.  Nothing more.  MacBlogz is an aggregator, so nothing is done to it on a daily basis.  With the ThinkBrilliant site, again, this impacts nothing when it comes to our time on SoulPancake.  These are bare bones sites, with almost no

Page 11 - AMENDED OPINION AND ORDER

> functionality, that take no time to run.  We redesigned the ThinkBrilliant site in about 3 hours, over the course of 6 weeks.  Rough estimate, I'd say each engineer puts in around 100 hours a week on SoulPancake.  This can tip under or over at any given time, but generally, that's how much of our time is spent on SP.

In June 2010, an interview of Hadar was published on the fastcompany.com website in which Hadar revealed that he hoped to launch a social media platform known as "Ziphook" with the City of Portland as a "partner."  Just days later, a mutual friend of Hadar and Wilson (or perhaps of Hadar and Gundry) apparently provided Wilson (or Gundry) with transcripts of some conversations that took place between the friend and Hadar over an "instant messaging" application in March 2010.  According to the transcripts, Hadar related to his friend that Think Brilliant was working on a project for the Portland mayor's office and the government of the City of Portland, that the project was "hugely" secret, that the friend was not to reveal its existence to anyone, and that the project was a platform to "bridge the business and social media worlds" called "Ziphook."[2]

All parties agree that on June 21, 2010, Hadar sent to Gundry a link providing full access to the LabCoat code, as well as administrative log-in credentials.  It appears further undisputed that Gundry, along with Tom Fillmore (whom plaintiffs allege to have acted as Zamani's agent),[3] reviewed the files to which defendants had been granted access.  Despite the fact that plaintiffs

---

[2] It may have been at this same time that defendants received transcripts of instant messaging conversations between Hadar and an unidentified interlocutor dating from February 2010 in which Hadar asserts that Think Brilliant owns all of the code it developed for SoulPancake, that SoulPancake and Gundry were "meant to get a wake up call," and that Hadar was prepared to go to the courts to establish that the technology was his own.

[3] Defendants offer Zamani's declaration that Fillmore was never his agent and, indeed, that Zamani is unacquainted with Fillmore.  Plaintiffs offer no evidence in support of their allegation that Fillmore acted as Zamani's agent when he reviewed plaintiffs' files.

acknowledge having provided defendants with access to the reviewed files, plaintiffs characterize defendants' review of the files as "hacking into" plaintiffs' proprietary databases.

According to defendants, Gundry was shocked and dismayed to discover, upon review of the files to which he had been granted access, that Think Brilliant "had been covertly doing extensive work on the development of Ziphook" during time it had committed to devoting 100% of its efforts to SoulPancake's project.  According to defendants, the Ziphook project as discovered by Gundry was a "large body of code" constituting "a complex piece of software, methodically architected, designed, and engineered over a period of several months."  According to plaintiffs, Gundry discovered "some highly proprietary coding work performed by Think Brilliant on an internal project referred to as Ziphook."  Plaintiffs assert that at this time, "Ziphook was a project in conceptual stage that had been conceived of by Think Brilliant personnel in the Spring of 2010," without explaining how "highly proprietary coding" work product had already been produced in connection with a project that had not progressed beyond the "conceptual stage."  Plaintiffs assert that, at that time, Think Brilliant personnel had "devoted a limited amount of time" to the Ziphook project.

Plaintiffs further assert that, as a result of Gundry and Fillmore's "hacking" activities of June 2010, the economic value of both LabCoat and Ziphook was "materially compromised, if not destroyed."  Plaintiffs provide no explanation as to the mechanism by which such spoliation was effected.

Plaintiffs take the position that their decision to develop Ziphook, to solicit and receive investment money to fund the development of Ziphook, and to seek buyers for the product, was in direct response to Wilson's advice that they seek other sources of work to generate necessary

revenue.  However, plaintiffs concede that they received an investment from a friend of Hadar's family in the amount of $150,000, specifically for the purpose of developing Ziphook, as early as March 2, 2010.

Plaintiffs further take the position that Wilson's assertion that Think Brilliant's work on Ziphook was in violation of Think Brilliant's commitment to work exclusively on SoulPancake's project, upon which Wilson's refusal to give plaintiffs any ownership interest in SoulPancake was purportedly based, was pure pretext.

On June 24, 2010, Wilson sent an email message to Hadar inquiring about Ziphook and asking for confirmation that Think Brilliant's employees were working exclusively on SoulPancake's project.  Hadar replied that the engineers funded by SoulPancake worked exclusively on SoulPancake matters, and that Ziphook was only a "possible idea" that Think Brilliant was "considering trying to make . . . happen."

On June 28, 2010, Gundry requested that Think Brilliant turn over all of the LabCoat code to SoulPancake.  According to defendants, Hadar at first pretended to accede to the request, but in fact provided a link to files that did not contain the LabCoat code.  When this was brought to Hadar's attention, according to defendants, Hadar responded by requesting documentary proof that SoulPancake owned LabCoat's source code as opposed to a single instance of the LabCoat package.  According to defendants, Think Brilliant did not ultimately provide the LabCoat code to SoulPancake.  According to plaintiffs, however, Think Brilliant did comply with the demand and did deliver the source code.

On June 30, 2010, Wilson, Gundry, Hadar, and Fields discussed the issue via teleconference.  It appears that Wilson and/or Gundry may have threatened a possible lawsuit

over Think Brilliant's involvement with Ziphook.  Hadar apparently asserted in the course of that conversation that "99.99%" of Think Brilliant coder time had been expended on SoulPancake, and that the Ziphook project amounted to no more than a "splash" webpage designed to solicit interested parties to provide their email addresses in exchange for information about the Ziphook concept, on which feedback would be solicited.

Plaintiffs and defendants appear to agree that following the June 30, 2010, teleconference, the Think Brilliant/SoulPancake joint venture was at an end.  Plaintiffs take the position that defendants used and relied on Think Brilliant's proprietary LabCoat and/or Ziphook platform to make the soulpancake.com website into a successful generator of revenue.  This action followed.

## ANALYSIS

As noted above, plaintiffs allege SoulPancake and Wilson's liability for breach of fiduciary duty, fraud, breach of contract, and quantum meruit, allege SoulPancake, Wilson and Zamani's liability for misappropriation of trade secrets, and allege Zamani's liability for civil conspiracy.  In addition, plaintiffs allege that SoulPancake and Wilson are estopped from denying that plaintiffs have a partial ownership interest in SoulPancake, and seek imposition of a constructive trust against SoulPancake and Wilson, injunctive relief to enjoin SoulPancake and Wilson from using certain work-product allegedly proprietary to plaintiffs, and declaratory judgment that Think Brilliant owns a 21% interest in SoulPancake.  To these claims, defendants assert the affirmative defenses of (i) failure to state a claim upon which relief may be granted, (ii) unclean hands, (iii) waiver, (iv) estoppel, (v) plaintiffs' breach of contract, (vi) breach of the implied covenant of good faith and fair dealing, (vii) offset, (viii) plaintiffs' prior breach of contract, (ix) failure of condition precedent, (x) offset (again), (xi) plaintiffs' wrongful conduct,

(xii) other parties' wrongful conduct, (xiii) ratification, (xiv) no right to attorney fees, (xv) no

right to punitive damages, and (xvi) absence of personal jurisdiction over Zamani.  In addition,

defendants purport to "reserve" all defenses listed under Federal Civil Procedure Rule 8(c).

For their part, defendants allege counterclaims of fraud, negligent misrepresentation,

conversion, breach of contract, and breach of the covenant of good faith and fair dealing against

Think Brilliant, and seek declaratory judgment against all plaintiffs and against Fite, Buckner,

and Weston that ThinkBrilliant has no ownership interest in SoulPancake and that SoulPancake

is the 100% owner of both LabCoat and Ziphook.  Against these counterclaims, plaintiffs assert

the affirmative defenses of (i) failure to state a claim upon which relief may be granted,

(ii) waiver, (iii) failure of condition precedent, (iv) excuse of performance, (v) estoppel,

(vi) unclean hands, and (vii) no right to attorney fees.

By and through their motion, plaintiffs move (i) to dismiss or, in the alternative, to strike

all of defendants' affirmative defenses (although in their reply memorandum plaintiffs withdraw

their motion to the extent it addresses defendants' first affirmative defense (failure to state a

claim on which relief can be granted), (ii) to strike defendants' claims for attorney fees, (iii) to

strike certain "evidentiary" material from defendants' answer, and (iv) to dismiss or, in the

alternative, to make more definite and certain defendants' claim of fraud.  Defendants move (i) to

dismiss all of plaintiffs' claims against Zamani for lack of personal jurisdiction, (ii) to dismiss or

to make more definite and certain plaintiffs' claim of fraud, and (iii) to dismiss plaintiffs'

quantum meruit claim.

Page 16 - AMENDED OPINION AND ORDER

## I.     Plaintiffs' Motion

### A.     Motion to Dismiss or Strike Defendants' Affirmative Defenses

Federal Civil Procedure Rule 8(b) provides, in part, that "[i]n responding to a pleading, a party must: . . . state in short and plain terms its defenses to each claim asserted against it."  Fed. R. Civ. P. 8(b)(1)(A).  "The key to determining the sufficiency of pleading an affirmative defense is whether it gives plaintiff fair notice of the defense."  *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979), *citing Conley v. Gibson*, 355 U.S. 41, 47-48 (1957); 5 Wright & Miller Federal Practice and Procedure, § 1274 at 323.  The courts may find an affirmative defense to be adequately pled if fair notice of the defense may be gleaned from materials filed in support of or in connection with the pled defense.  *See id.*

Plaintiffs argue that fifteen of the sixteen affirmative defenses set forth in defendants' pleading are defective in that they are not supported by factual allegations sufficient to establish the required elements of the defenses.  Implicitly, plaintiffs appear to take the position that a factual allegation may only be construed as supporting an affirmative defense if it is alleged in express support of the defense.  However, under applicable case law, it is appropriate to consider all facts alleged in defendants' pleading when determining whether plaintiffs have fair notice of defendants' various affirmative defenses.

Analysis of defendants' pleading establishes that defendants' have made factual allegations sufficient to provide plaintiffs with fair notice of their first affirmative defense (failure to state a claim on which relief can be granted), second affirmative defense (unclean hands), fifth affirmative defense (plaintiffs' breach of contract), sixth affirmative defense (plaintiffs' breach of the implied covenant), seventh affirmative defense (offset), eighth

affirmative defense (plaintiffs' prior breach of contract), ninth affirmative defense (failure of condition precedent), tenth affirmative defense (offset), eleventh affirmative defense (plaintiffs' wrongful acts), thirteenth affirmative defense (ratification), fourteenth affirmative defense (no right to attorney fees), fifteenth affirmative defense (no right to punitive damages), and sixteenth affirmative defense (absence of personal jurisdiction over Zamani). However, I agree with plaintiffs that defendants have failed to give fair notice of their third affirmative defense (waiver), fourth affirmative defense (estoppel), twelfth affirmative defense (third parties' wrongful acts), and reservation of unspecified and unasserted defenses. Waiver is a knowing relinquishment of a right, and defendants have not shown in what way plaintiffs may have knowingly waived any right. Estoppel applies where a party takes inconsistent positions in legal proceedings, and defendants have not alleged that plaintiffs have done so. Similarly, defendants have made no allegation that plaintiffs' damages were caused by the actions of any third party to this lawsuit. Finally, there is no basis in the Federal Civil Procedure Rules for "reserving" unasserted and unsupported affirmative defenses as to which plaintiffs lack any particularized notice.

For the foregoing reasons, plaintiffs' motion to dismiss defendants' affirmative defenses is granted as to defendants' third affirmative defense (waiver), fourth affirmative defense (estoppel), twelfth affirmative defense (third parties' wrongful acts), and reservation of unspecified and unasserted defenses, and is otherwise denied.

Notwithstanding the foregoing, I note that defendants' fifth and eighth affirmative defenses (plaintiffs' breach of contract and plaintiffs' prior breach of contract) are so similar to one another as to defy meaningful distinction, as are defendants' seventh and tenth affirmative

Page 18 - AMENDED OPINION AND ORDER

defenses (each for offset of damages).  Plaintiffs' motion in the alternative to strike defendants'

affirmative defenses is therefore granted as to defendants' fifth affirmative defense (plaintiffs'

breach of contract) and seventh affirmative defense (offset) as redundant and impertinent, and is

otherwise denied.

### B.    Motion to Strike Claims for Attorney Fees

Plaintiffs note, correctly, that defendants assert a right to attorney fees at paragraphs 67

(in connection with their negligent misrepresentation claim), 73 (in connection with their

conversion claim), 77 (in connection with their breach of contract claim), and 82 (in connection

with their implied covenant claim) of their pleading, and again in their prayer for damages.

Plaintiffs assert that defendants have not alleged, and in any event lack, any statutory or other

basis for asserting any such claims of entitlement to attorney fees.  For their part, defendants

concede that they have no right to attorney fees in connection with their negligent

misrepresentation, conversion, or breach claims, and on that basis concede that their assertions in

paragraphs 67, 73, 77, and 82 of their pleading to entitlement to award of attorney fees were

inappropriate. In consequence, plaintiffs' motion to strike is granted as to defendants' assertions

of entitlement to award of attorney fees contained in paragraphs 67, 73, 77, and 82 of defendants'

pleading.

However, defendants argue that their prayer for attorney fees is appropriate.  Defendants

note, correctly, that plaintiffs have asserted defendants' liability for misappropriation of trade

secrets.  Under Oregon law, a court presented with a misappropriation of trade secrets claim may

award a prevailing party its attorney fees if the "claim of misappropriation is made in bad faith."

Or. Rev. Stat. 646.467.  Analysis of defendants' pleading establishes that defendants have alleged

facts from which a trier of fact could reasonably conclude that plaintiffs brought their

misappropriation claim in bad faith.  In consequence, plaintiffs' motion to strike is denied as to

defendants' prayer for attorney fees.

### C.    Motion to Strike "Evidentiary" Material

Plaintiffs note, correctly, that at paragraphs 17, 32, 36, 37, 39-43, 46, 47, 49, 51, and 54

of defendants' pleading, defendants purport to recite quotes from Hadar's email or instant

messaging communications with third parties.  Plaintiffs argue that all such purportedly quoted

language should be stricken from defendants' pleading as improperly evidentiary, and/or as

immaterial, impertinent, and scandalous.

As to the argument that the purportedly quoted language is inappropriately pled because it

constitutes evidence as opposed to factual allegation, no procedural rule bars any party from

quoting an opposing party's statements within a pleading.  Moreover, although the recited

language is characterized as a series of direct quotations from Hadar's communications, such

characterization does not render the recitals evidentiary in character.

As to the argument that the purportedly quoted language may be stricken as immaterial,

impertinent, or scandalous, analysis of the language establishes that it is clearly neither

immaterial nor impertinent.  The language is of direct relevance to several of defendants' claims,

including their claims of fraud, breach of contract, and breach of the covenant of good faith and

fair dealing.  Analysis further establishes that the language contains no propositions sufficiently

scandalous to warrant being stricken from defendants' pleading.

For the foregoing reasons, plaintiffs' motion to strike material characterized as

"evidentiary" from defendants' pleading is denied.

**D.      Motion to Dismiss or to Make More Definite and Certain Defendants' Fraud Claim**

Defendants' first counterclaim for relief alleges Think Brilliant's liability for fraud.  Under

Oregon law, the elements of a fraud claim are:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*Webb v. Clark*, 274 Or. 387, 391 (1976); *Johnsen v. Mel-Ken Motors*, 134 Or. App. 81, 89

(1995).  Federal Civil Procedure Rule 9(b) provides, in relevant part, that "[i]n all averments of

fraud or mistake, the circumstances constituting fraud or mistake shall be stated with

particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred

generally."  Fed. R. Civ. P. 9(b). When sitting in diversity, this court applies state law as to the

elements of a plaintiff's fraud claim, but applies federal law as to how such elements must be

pled:

> It is established law, in this circuit and elsewhere, that Rule 9(b)'s particularity requirement applies to state-law causes of action.  While a federal court will examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action, the Rule 9(b) requirement that the circumstances of the fraud must be stated with particularity is a federally imposed rule.

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003) (citations, internal quotation

marks omitted)

The Rule 9(b) particularity requirement is satisfied if the pleading "identifies the

circumstances constituting fraud . . . so that the defendant can prepare an adequate answer from

the allegations."  *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).

Page 21 - AMENDED OPINION AND ORDER

That is, the allegations must be sufficiently specific "to give defendants notice of the particular misconduct which is alleged to constitute the fraud . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidener*, 780 F.2d 727, 731 (9th Cir. 1985).

Plaintiffs move to dismiss defendants' fraud claim for failure to comply with the requirements of Rule 9(b) and, in the alternative, to make defendants' fraud claim more definite and certain. However, analysis of defendants' pleading establishes that defendants' fraud claim is pled with adequate particularity. At paragraph 1 of defendants' pleading, defendants allege that Think Brilliant agreed to work exclusively on soulpancake.com but nevertheless diverted resources to a "secret project" to create a competitive application that Think brilliant intended to market as its own. At paragraph 4 of defendants' pleading, defendants recite a numerated list of representations allegedly made by plaintiffs, allege that each representation was untrue, allege that Think Brilliant intentionally deceived SoulPancake through the representations, and allege that Think Brilliant intended for SoulPancake to rely on the representations by continuing to fund Think Brilliant's operations. Additional recitals of Think Brilliant's alleged false representations appear at paragraphs 19, 23, and 32 of defendants' pleading. Additional allegations that Think Brilliant was aware of the representations' falsehood and intended for SoulPancake to rely on them to its detriment appear at paragraphs 34-38, 39-40, and 42-45m of defendants' pleading. Taken together, these allegations identify the circumstances allegedly constituting fraud with sufficient precision to permit plaintiffs to prepare a defense. Plaintiffs' motion to dismiss or to make more definite and certain defendants' claim of fraud is therefore denied.

Page 22 - AMENDED OPINION AND ORDER

II.    **Defendants' Motion to Dismiss and/or Make More Definite and Certain**

A.    **Motion to Dismiss Claims Against Zamani for Lack of Personal Jurisdiction**

Plaintiffs allege Zamani's liability for misappropriation of trade secrets and civil conspiracy.  Defendants argue that those claims should be dismissed to the extent alleged against Zamani, on the grounds that the court lacks personal jurisdiction over Zamani.

"When no federal statute governs personal jurisdiction, the district court applies the law of the forum state." *Id.*, *citing Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998).  Oregon's long-arm statute creates a standard co-extensive with federal jurisdictional standards, *see* Or. R. Civ. P. 4L, so a federal court sitting in the District of Oregon may exercise personal jurisdiction wherever it is possible to do so within the limits of federal constitutional due process, *see*, *e.g.*, *Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th Cir. 1990).

Federal due process jurisprudence requires that, to be subject to the personal jurisdiction of a federal court, a nonresident defendant must have at least "'minimum contacts'" with the court's forum state such that "the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004), *quoting International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Two forms of personal jurisdiction are available for application to a nonresident defendant:  general personal jurisdiction and specific personal jurisdiction.

"For general jurisdiction to exist over a nonresident defendant . . . , the defendant must engage in continuous and systematic general business contacts . . . that approximate physical presence in the forum state." *Schwarzenegger*, 374 F.3d at 801, *quoting Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984) and *Bancroft & Masters, Inc. v. Augusta*

Page 23 - AMENDED OPINION AND ORDER

*Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000).  "This is an exacting standard, as it should be, because a finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world."  *Id.*, citing *Brand v. Menlove Dodge*, 796 F.2d 1070, 1073 (9th Cir. 1986).

The courts of the Ninth Circuit apply a three-pronged test for determining whether the exercise of specific personal jurisdiction over a nonresident defendant is appropriate:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802, *quoting Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987). The plaintiff bears the burden of satisfying the first two prongs of the test, whereupon the burden shifts to the defendant to "'present a compelling case' that the exercise of jurisdiction would not be reasonable."  *Id.*, quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985).

In the context of cases that sound primarily in tort, courts have considered it sufficient to satisfy the first prong of the test where the only contact a nonresident defendant had with the forum state was "the 'purposeful direction' of a *foreign* act having *effect* in the forum state." *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1397 (9th Cir. 1986) (emphasis original), *citing Calder v. Jones*, 465 U.S. 783, 789 (1984).  This "'effects' test requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the

forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum

state."  *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002).  "The requirement is but a

test for determining the more fundamental issue of whether a 'defendant's conduct and connection

with the forum state are such that he should reasonably anticipate being haled into court there.'"

*Id.*, quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

The second prong of the test requires that the plaintiff's claim arise out of the nonresident

defendant's forum-related activities.  *See Boschetto*, 539 F.3d at 1016.

At the third prong of the test, the burden shifts to the defendant to present a "compelling

case" to rebut the presumption that the exercise of specific personal jurisdiction would be

reasonable.  *See id.*

> In determining reasonableness, th[e] [courts of the Ninth] circuit examine[] seven
> factors:  the extent of purposeful interjection; the burden on the defendant to
> defend the suit in the chosen forum; the extent of conflict with the sovereignty of
> the defendant's state; the forum state's interest in the dispute; the most efficient
> forum for judicial resolution of the dispute; the importance of the chosen forum to
> the plaintiff's interest in convenient and effective relief; and the existence of an
> alternative forum.

*Shute v. Carnival Cruise Lines*, 897 F.2d 377, 386 (9th Cir. 1990), *citing Federal Deposit Ins.*

*Corp. v. British-American Ins. Co., Ltd.*, 828 F.2d 1439, 1442 (9th Cir. 1987).  "The court[s]

must balance the seven factors to determine whether the exercise of jurisdiction would be

reasonable."  *Id.*, citing *British-American*, 828 F.2d at 1442.

Here, Zamani is a resident of California and not of Oregon, he was not served in Oregon,

and he has not consented to jurisdiction in Oregon.  Plaintiffs advance the argument that this

court may nevertheless exercise personal jurisdiction over him, both on a theory of general

personal jurisdiction and on a theory of specific personal jurisdiction.

Page 25 - AMENDED OPINION AND ORDER

As to general personal jurisdiction, plaintiffs point to evidence that Zamani founded two companies (autoweb.com and reply.com) which maintain interactive websites that may be accessed from Oregon, and that at times material to plaintiffs' claims Zamani was an officer, director, and shareholder of one of the two companies (reply.com) and might have been a shareholder of the other (autoweb.com). Plaintiffs take the position that Zamani's role in these two companies is the equivalent of physical presence in Oregon, giving rise to general personal jurisdiction over Zamani in Oregon. In support, plaintiffs cite to a corpus of cases discussing the circumstances under which maintenance of interactive websites can give rise to *specific*, as opposed to *general*, personal jurisdiction over a defendant.

Plaintiffs' argument as to general personal jurisdiction is entirely unpersuasive. Even if the business contacts of autoweb.com and/or reply.com were sufficiently continuous and systematic to justify exercise of general personal jurisdiction over those entities – and plaintiffs have not provided evidence sufficient to support that conclusion – that fact would be without bearing on whether Zamani himself maintained systematic and continuous business contacts with Oregon. The two companies are presumed to be separate entities from Zamani himself, and plaintiffs have not provided any evidence that either company should be construed as Zamani's alter ego. In the absence of any evidence that Zamani himself maintains continuous and systematic business contacts with Oregon, I conclude that the court may not properly exercise general personal jurisdiction over Zamani.

As to specific personal jurisdiction, plaintiffs take the position that Zamani directed activity into Oregon when he:

(a) personally invested in software development work being done in Oregon; (b)

promised to provide current and future funding for work done by an Oregon
company; (c) traveled to Oregon to further integrate himself into the operations of
Think Brilliant; (d) promised to solicit sponsorships to fund SoulPancake and the
work being done by Think Brilliant; (e) promised to make ongoing investments to
keep Think Brilliant's expenses covered; and (f) intentionally committed torts
directed at, and with consequences to, Oregon victims.

Addressing first plaintiffs' contention that their claims arise out of Zamani's purportedly
forum-related activities of investing in SoulPancake (which was paying for software
development work being done in Oregon), promising to provide funding to SoulPancake for
work to be performed by Think Brilliant, promising to solicit sponsorships to fund SoulPancake
(and by extension SoulPancake's payments to Think Brilliant), and promising to make ongoing
investments in SoulPancake (to permit SoulPancake to pay Think Brilliant's expenses), as a
preliminary matter it is worth noting that Zamani is not alleged ever to have consummated any
deal directly with Think Brilliant or its principals; to the contrary, the allegations and evidence all
suggest that Zamani's promises were directed solely to SoulPancake, with only indirect
consequences for Think Brilliant.  As such, Zamani's investment in SoulPancake and alleged
promises to keep SoulPancake funded were not purposefully directed into Oregon.  Moreover,
even if Zamani's activities were construed as purposefully directed into Oregon, plaintiffs' claims
against Zamani (misappropriation of trade secrets and civil conspiracy to effect Wilson's alleged
torts against plaintiffs) do not arise out of Zamani's various alleged commitments to provide
funding to SoulPancake.

By contrast, Gundry and Zamani's May 2010 trip to Oregon to meet with Hadar and
Fields was clearly purposefully directed into Oregon.  Nevertheless, as with Zamani's investment
in and promises to SoulPancake, plaintiffs' claims do not in any sense arise out of Zamani's travel

to Oregon.

Finally, plaintiffs argue that Zamani directed tortious activity into Oregon by directing his agent Fillmore to "hack" into plaintiffs' proprietary database.  As noted above, however, defendants offer Zamani's sworn declaration that Fillmore was not Zamani's agent and that Zamani is unacquainted with Fillmore, and plaintiffs offer no evidence in support of their allegation to the contrary.  In the context of a motion to dismiss on personal jurisdictional grounds, the federal courts may appropriately consider evidence in the form of affidavits or declarations.  *See*, *e.g.*, *Unocal.*, 248 F.3d at 922.  I therefore do not credit as true for purposes of defendants' jurisdictional motion plaintiffs' allegation that Fillmore acted as Zamani's agent.

I note, however, that plaintiffs allege that Zamani and Wilson "conspired . . . to squeeze plaintiffs out of the SoulPancake Project, deny plaintiffs their interest in SoulPancake, LLC and [s]oul[p]ancake.com, LLC, and misappropriate for their own use the proprietary work-product owned and created by plaintiffs."  In Oregon, civil conspiracy "is not a separate tort or basis for recovery but, rather, a theory of mutual agency under which a conspirator becomes jointly liable for the tortious conduct of his or her co-conspirators." *Osborne v. Fadden*, 225 Or. App. 431, 437 (2009). Moreover, "[f]or purposes of personal jurisdiction, the actions of an agent are attributable to the principal." *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990), *citing Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 419 (9th Cir. 1977).  Plaintiffs expressly allege that Gundry acted as Wilson's agent in connection with Gundry and Fillmore's review of plaintiffs' files.  Although plaintiffs do not propound the theory, to the extent that Gundry allegedly directed tortious activity into Oregon while acting as Wilson's agent, assuming the truth of plaintiffs' uncontroverted allegations his actions would therefore be attributable to his

principal Wilson and, transitively, from Wilson to Wilson's alleged co-conspirator (and,

therefore, principal) Zamani.  Similarly, Wilson's alleged actions in purposefully directing the

tortious activity of breach of fiduciary duty and fraud into Oregon would likewise be attributable

to Zamani.

The question thus necessarily arises whether plaintiffs' allegations that Zamani conspired

with Wilson are sufficient to pass muster under *Twombly* and *Iqbal*.  As noted above, under

*Twombly* a viable cause of action must be supported by factual allegations sufficient to "raise a

right to relief above the speculative level," *Twombly*, 550 U.S. at 555, while *Iqbal* established

that to raise a right to relief above the speculative level, a plaintiff must plead affirmative factual

content that "allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged," *Iqbal*, 129 S. Ct. at 1949.  Plaintiffs allege that Zamani "owned a company

hat performed web design and related technology services similar to Think Brilliant," First

Amended Complaint, ¶ 36, that "Wilson purported to sell to Zamani a percentage ownership in

Think Brilliant's LabCoat platform without Think Brilliant's knowledge or consent," *id.* at ¶ 37,

that "Wilson instructed Think Brilliant to meet with . . . Gundry and . . . Zamani to fully explain

the details of plaintiffs' extensive work on the SoulPancake Project and Labcoat [and]

specifically insisted plaintiffs disclose all of their work-product to Gundry and Zamani," *id.* at ¶

38, that after hearing plaintiffs explain their work "Zamani concluded the meeting by telling

plaintiffs that a payment should be made to Think Brilliant to pay for [plaintiffs'] expenses to

conclude their work for the remainder of 2010," *id.* at ¶ 39, that "Zamani conspired with . . .

Wilson to squeeze plaintiffs out of the SoulPancake Project, deny plaintiffs their interest in

SoulPancake, LLC and [s]oul[p]ancake.com, LLC, and misappropriate for their own use the

Page 29 - AMENDED OPINION AND ORDER

proprietary work-product owned and created by plaintiffs," *id.* at ¶ 78, that "Zamani and . . .

Wilson agreed upon a common scheme and course of action to accomplish this end," *id.* at ¶ 79,

that "Zamani aided, abetted, participated and acted in concert to achieve the acts and omissions

alleged [elsewhere] constituting . . . Wilson's breach of fiduciary duties, fraud and

misappropriation of trade secrets" *id.* at ¶ 80, and that the defendants "actively concealed [their]

discussions and plans developed with . . . Zamani to squeeze plaintiffs out of the SoulPancake

Project," *id.* at ¶ 66(E).  While plaintiffs' averments of conspiracy are supported with only

minimal factual allegations, taken collectively they are, albeit by the narrowest of margins,

sufficient to permit a finder of fact to draw the inference that the alleged conspiracy occurred.  As

such, they are sufficient to establish, for purposes of the jurisdictional motion now before the

court, the imputability of Gundry's and Wilson's actions to Zamani.

Because Gundry's and Wilson's forum-directed actions are both sufficient to permit the

court to exercise personal jurisdiction over Wilson and attributable for personal jurisdictional

purposes to Zamani, defendants' motion to dismiss plaintiffs' claims against Zamani on personal

jurisdictional grounds is denied.

### B.    Motion to Dismiss or to Make More Definite and Certain Plaintiffs' Fraud Claim

Plaintiffs' second claim for relief alleges Wilson and SoulPancake's liability for fraud.

The substantive elements of fraud under Oregon law and the federal procedural requirements for

pleading fraud are set forth *supra*, at Section I(D).  Defendants move to dismiss plaintiffs' fraud

claim for failure to comply with the requirements of Federal Civil Procedure Rule 9(b) and, in

the alternative, to make defendants' fraud claim more definite and certain.

In support of their fraud claim, plaintiffs allege as follows:

Defendants engaged in fraudulent conduct in one or more of the following ways:

A.    Defendants represented that they would convey an ownership interest in SoulPancake, LLC;

    1.    Creating "transitive equity" as a subterfuge to their intention to leave plaintiffs with nothing; and

    2.    Making a promise to convey ownership in an entity when they had no intention of either creating the entity or conveying ownership;

B.    Defendants intentionally refused to fund Think Brilliant's ongoing business expenses, as promised, in order to starve plaintiffs and force them into submission through economic duress;

C.    Defendants constructed a false pretext that plaintiffs had "breached" the agreement by working on other projects, and used that false pretext to exert economic duress;

D.    Defendants demanded that plaintiffs transfer plaintiffs' proprietary work-product, defendants fully utilized that work-product for their own benefit, knowing they were not entitled to do so;

E.    Defendants failed to divulge, and actively concealed defendants' discussions and plans developed with Payam Zamani to squeeze plaintiffs out of the SoulPancake Project; and

F.    Defendants hacked, reviewed and misappropriated plaintiffs' proprietary work-product in the Ziphook product, knowing that plaintiffs had not given permission or consent for defendants to do so.

Plaintiffs' First Amended Complaint, ¶ 66.  In addition, plaintiffs expressly rely on all of their

general factual allegations.

      Plaintiffs' factual allegations set forth, albeit minimally, the circumstances allegedly

constituting at least one theory of fraud.  Although plaintiffs allege in paragraph 66(A) only that

"[d]efendants" represented that they would convey to the plaintiffs an ownership interest in

Page 31 - AMENDED OPINION AND ORDER

SoulPancake, without specifying which of Wilson or SoulPancake actually made the representation, because SoulPancake is a corporate entity it is reasonable to infer that only Wilson can have made the representation.  In paragraph 66(A)(2) plaintiffs allege that defendants knew that the alleged representation was false when it was made.  Although plaintiffs do not expressly allege that Wilson and SoulPancake intended plaintiffs to rely on the accuracy of the alleged misrepresentation to plaintiffs' detriment, the circumstances constituting fraud are minimally specified.  it would therefore be inappropriate to dismiss plaintiffs' fraud claim at this stage of these proceedings.

However, I agree with defendants that, considered collectively, plaintiffs' allegations are so vague or ambiguous that defendants cannot reasonably prepare a response addressing all of plaintiffs' various averments.  Several of the allegations expressly made in support of the fraud claim do not appear to have any bearing on the question whether Wilson's or SoulPancake's conduct was fraudulent (including the allegations that defendants' assertions that plaintiffs breached the parties' agreement were pretextual, that defendants demanded transfer of plaintiffs' work product, and that defendants intentionally misappropriated plaintiffs' trade secrets).  Other allegations could conceivably be interpreted as advancing alternative or additional theories of fraud (including allegations that could be read to suggest that defendants' alleged misappropriation of trade secrets was accomplished through fraud), but could also be read otherwise.

Wilson and SoulPancake are entitled to a clear statement of all of the circumstances that plaintiffs believe constitute fraudulent conduct.  Defendants' motion to make more definite and certain is therefore granted as to plaintiffs' fraud claim, and plaintiffs are directed to

Page 32 - AMENDED OPINION AND ORDER

amend their claim so as to provide a clear statement of all of their specific averments of fraud.

**C.    Motion to Dismiss Plaintiffs' Quantum Meruit Claim**

Plaintiffs seventh claim for relief alleges a claim of quantum meruit premised on the

theory that defendants enriched themselves to plaintiffs' detriment by obtaining "possession pf

plaintiffs' proprietary work-product in the [s]oul[p]ancake.com website and the Lab[C]oat

platform by trickery and deceit" and by converting "plaintiffs' proprietary work-product in the

Ziphook project, knowing that plaintiffs did not consent to defendants' possession, hacking and

use of that work-product."  Plaintiffs' First Amended Complaint, ¶¶ 101-102.  Defendants argue

that, as such, plaintiffs' quantum meruit claim is preempted by Oregon's Trade Secrets Act.

Oregon's Trade Secrets Act expressly provides for preemption of certain "conflicting"

civil remedies for misappropriation of trade secrets:

(1)    Except as provided in subsection (2) of this section, ORS 646.461 to
646.475 supersede conflicting tort, restitution or other law of Oregon
providing civil remedies for misappropriation of a trade secret.

(2)    ORS 646.461 to 646.475 shall not affect:

(a)    Contractual remedies, whether or not based upon misappropriation
of a trade secret;

(b)    Other civil remedies that are not based upon misappropriation of a
trade secret;

(c)    Criminal remedies, whether or not based upon misappropriation of
a trade secret; or

(d)    Any defense, immunity or limitation of liability afforded public
bodies, their officers, employees or agents under ORS 30.260 to
30.300.

(3)    Notwithstanding any other provision in ORS 646.461 to 646.475, public
bodies and their officers, employees and agents are immune from any

Page 33 - AMENDED OPINION AND ORDER

claim or action for misappropriation of a trade secret that is based on the disclosure or release of information in obedience to or in good faith reliance on any order of disclosure issued pursuant to ORS 192.410 to 192.490 or on the advice of an attorney authorized to advise the public body, its officers, employees or agents.

Or. Rev. Stat. 646.473.

Defendants appear to be correct in characterizing plaintiffs' quantum meruit claim as premised on defendants' alleged misappropriation of plaintiffs' trade secrets.  Nevertheless, plaintiffs are entitled to plead their quantum meruit claim in the alternative to their misappropriation claim.  If, for example, evidence offered at a later stage of these proceedings were to establish that the work-product allegedly misappropriated from the plaintiffs did not constitute a trade secret, causing the misappropriation claim to fail, the quantum meruit claim could still lie, depending on the state of the evidence then in the record.  Moreover, defendants have not established that the remedy provided by a quantum meruit claim – a remedy generally characterized as quasi-contractual – does not constitute a "[c]ontractual remedy" statutorily exempt from the preemptive effect of the Trade Secrets Act.  Or. Rev. Stat. 646.473(2)(a).  Defendants' motion to dismiss plaintiffs' claim of quantum meruit is therefore denied.

## CONCLUSION

For the reasons set forth above, plaintiffs' motion (#39) to dismiss or to strike defendants' affirmative defenses, to strike defendants' claims for attorney fees, to strike certain "evidentiary" material from defendants' answer, and to dismiss or to make more definite and certain defendants' claim of fraud is granted in part and denied in part as follows:  plaintiffs' motion to dismiss defendants' affirmative defenses is granted as to defendants' third affirmative defense (waiver), fourth affirmative defense (estoppel), twelfth affirmative defense (third parties'

wrongful acts), and unenumerated reservation of additional defenses, and is otherwise denied,

plaintiffs' alternative motion to strike defendants' affirmative defenses is granted as to defendants'

fifth affirmative defense (plaintiffs' breach of contract) and seventh affirmative defense (offset),

and is otherwise denied, plaintiffs' motion to strike defendants' claims for attorney fees is granted

as to defendants' assertions of entitlement to award of attorney fees contained in paragraphs 67,

73, 77, and 82 of defendants' pleading, and is otherwise denied, plaintiffs' motion to strike certain

"evidentiary" material from defendants' answer is denied, and plaintiffs' motion to dismiss or to

make more definite and certain defendants' fraud claim is denied.  Defendants' motion (#41) to

dismiss all of plaintiffs' claims against Zamani for lack of personal jurisdiction, to dismiss or to

make more definite and certain plaintiffs' claim of fraud, and to dismiss plaintiffs' quantum

meruit claim is granted in part and denied in part as follows:  defendants' motion to dismiss

plaintiffs' claims against Zamani for lack of personal jurisdiction is denied, defendants' motion to

dismiss plaintiffs' fraud claim is denied, defendants' alternative motion to make more definite and

certain plaintiffs' fraud claim is granted, and defendants' motion to dismiss plaintiffs' quantum

meruit claim is denied.   Plaintiffs are directed to amend their pleading to state all of the

circumstances allegedly constituting actionable fraud by defendants Wilson and SoulPancake

clearly and with particularity.


Dated this 28th day of June, 2011.

 /s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge


Page 35 - AMENDED OPINION AND ORDER